# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 35699

| | | |
|---|---|---|
| IN THE INTEREST OF: JOHN DOE, A CHILD UNDER EIGHTEEN YEARS OF AGE. | ) ) ) | |
| ---------------------------------------------------------- | ) | Boise, February 2009 Term |
| STATE OF IDAHO, | ) ) | 2009 Opinion No. 54 |
| Plaintiff-Respondent, | ) ) | Filed: April 8, 2009 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JOHN DOE, | ) ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County. Honorable Gregory F. Frates, Magistrate Judge. Honorable Gordon W. Petrie, District Judge.

Order of the district court on appeal from the magistrate court is <u>affirmed</u>.

Thomas A. Sullivan, Caldwell, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Rebekah A. Cudé argued.

———————————————

J. JONES, Justice

The State filed a petition charging twelve-year-old John Doe with attempted first-degree murder, battery with intent to commit a serious felony, and forcible penetration by use of a foreign object. In addition to the charges, the State filed a motion to waive juvenile court jurisdiction over Doe. The juvenile court granted the State's motion and entered an order waiving Doe into adult court. Doe appealed the order to the district court, which affirmed the waiver order. Doe then obtained a stay of the proceedings in order to pursue an appeal to this Court. We affirm.

## I.

On January 24, 2007, at approximately 2:30 in the afternoon, two boys, C. J. and C. L., were riding their bikes down an alley in Nampa, Idaho. While riding their bikes, the boys

1

observed Doe step into the alley from around a corner near some bushes. As the boys approached Doe, Doe asked them "What are you guys doing back here?" At that point, C. J. noticed a young girl, who was naked from the waist down and appeared to be unconscious, lying under some bushes located approximately ten feet away from where Doe was standing. In addition to being hidden under the bushes, the girl was covered with what C. J. described as some sort of roofing material.

Once C. J. noticed the girl, he told C. L. to go call the police while he kept an eye on Doe. As they were waiting for the police, Doe repeatedly told C. J. "I didn't do it" and that he wanted to go home. On two occasions, Doe attempted to leave the alley, but C. J. was able to apprehend and detain him until the police arrived.

Nampa Police Officer Jamie Burns was the first officer to arrive on the scene. Upon arriving, Officer Burns located the young girl lying under the bushes, still unconscious. Based on the girl's location, it was apparent that she had been placed under the bushes and covered with the roofing material in order to avoid detection by people traveling down the alley. Once Officer Burns uncovered the girl, he observed that she was naked from the waist down, cold to the touch, and had red dots on her face and eyes. He also noticed her pants and underwear lying nearby.

After prompting by Officer Burns, the girl eventually began to regain consciousness. She was then identified and taken by ambulance to Mercy Medical Center. Upon arriving at Mercy Medical Center, the victim, R. M., was questioned by Detective Angela Weekes. During the questioning, R. M. identified Doe as her assailant and informed Detective Weekes that Doe had taken her outside of her house, punched her in the stomach, put a sock in her mouth, and touched her everywhere.

R. M. was subsequently transferred to St. Luke's Regional Medical Center, where she was hospitalized for three days. Based on a review of R. M.'s medical reports, pathologist Michelle Penelope Elieff later testified that R. M. had "suffered great bodily harm, was assaulted vaginally, suffered blunt force trauma to the abdomen, had vaginal penetration and had symptoms of oxygen deprivation due to pressure being applied to the chest and/or strangulation."[1] Elieff also testified that if R. M. had not been discovered when she was, there was a significant likelihood that she would not have survived.

---

[1] According to Elieff, the red marks on R. M.'s face indicated that she had suffered hemorrhaging of the small blood vessels, which is often caused by strangulation or obstruction of the airway.

Upon further investigation of the incident, police discovered that Doe had been at R. M.'s house earlier that same day. Doe apparently missed the bus home from school and walked to R. M.'s house so he could use the telephone to call his mother.[2] R. M.'s mother allowed Doe to use the telephone in the basement, where she and her husband were playing cards. R. M. was also in the basement at that time. While at R. M.'s home, Doe reportedly used the telephone, smoked a cigarette, and then went back upstairs to leave. After Doe went upstairs, R. M.'s mother heard the door shut and, thinking Doe had left, sent R. M. upstairs to take a nap. Approximately twenty minutes later R. M.'s mother received a telephone call from the police informing her that they had found her daughter in the alley behind the family's home.

Doe was subsequently charged with attempted first-degree murder, battery with intent to commit a serious felony, and forcible penetration by use of a foreign object. In addition to the charges, the State filed a motion to waive juvenile court jurisdiction and have Doe tried as an adult. A waiver hearing was held on March 8, 2007, but was postponed after the magistrate judge ordered Doe to undergo a competency evaluation. The order was based on the court's finding that Doe was unable to assist in his own defense and, therefore, was unfit to stand trial. Doe was then committed to the custody of the Department of Health and Welfare (the Department) and transferred to the Northwest Children's Home (NCH) for "competency training."

During the period of Doe's competency training, the Department sent regular updates of Doe's progress to the magistrate judge. In June 2007, the Department informed the court that, according to its most recent evaluation, Doe was still incompetent to stand trial.[3] Therefore, it requested an additional ninety days to continue Doe's competency training. Based on the Department's report, the court concluded that Doe was not yet competent to assist in his own defense and ordered that Doe's competency be reviewed again in ninety days. Before the entire ninety days elapsed, however, Doe passed a competency evaluation and the court found Doe competent to stand trial. The waiver proceedings commenced almost immediately thereafter.

Testimony regarding whether Doe should be waived into adult court was heard over the course of three days. During the hearings, the court heard testimony from several professionals within the juvenile and adult criminal justice systems. Of particular significance was the

---

[2] Doe's family and R. M.'s family had been friends for several years.
[3] Doe failed a competency evaluation administered on May 29, 2007.

testimony of Dr. Craig Beaver, the psychologist appointed to evaluate Doe. Dr. Beaver testified that he believed Doe should not be tried as an adult. According to Dr. Beaver, Doe would have problems understanding adult criminal proceedings due to his "developmental levels and cognitive limitations," but would be able to assist in and understand juvenile proceedings. Dr. Beaver based this opinion on his belief that, unlike adult criminal proceedings, juvenile proceedings could be conducted at a slower pace, which would enable Doe to maintain a better understanding of the process.

In addition to testimony, the court received two documents relevant to its waiver determination. Specifically, the court received a copy of Dr. Beaver's psychological evaluation of Doe and of a waiver report prepared by the Juvenile Probation Department. In accord with his testimony, Dr. Beaver recommended in his psychological evaluation that Doe remain in the juvenile legal system. Dr. Beaver based this recommendation on several concerns, which he noted in the evaluation. First, Dr. Beaver was concerned that Doe's poor language, concentration, and intellectual skills would preclude him from "communicat[ing] effectively with legal counsel in an adult proceeding." Doe's full scale I.Q. of 75 placed him in the fifth percentile of other children his age, which was "in the borderline mentally deficient range of intellectual skills and abilities." When compared to other twelve year olds, Dr. Beaver concluded that "[Doe] is significantly immature and much more limited." Second, Doe did not possess adequate socialization and, therefore, behaved inappropriately in various situations. According to Dr. Beaver, Doe demonstrated significant limitations in his ability "to interact appropriately with others and to participate within specific systems." This, in turn, raised questions regarding Doe's ability "to regulate and manage his behavior without being dangerous or assaultive to others." Third, Doe had a significant drug and alcohol history for a child his age and showed symptoms of depression. Fourth, Doe had little familial support, structure, and supervision. Instead of setting boundaries and providing structure, Doe's parents condoned his use of alcohol, tobacco, and marijuana. Additionally, it was not unusual for Doe's mother, who was unemployed and on probation for possession of methamphetamine, to remain away from home for days – leaving Doe and his sisters without food.[4] Finally, Doe was suffering from

---

[4] In fact, several child protection cases alleging neglect and abuse had been filed against Doe's parents since Doe's birth.

4

Oppositional Defiant Disorder, Adjustment Disorder, and Attention Deficit/Hyperactive Disorder.

In light of these observations, Dr. Beaver thought that it would be best for Doe to remain in the juvenile system. However, because Doe had failed supervised probation and his family life raised "significant alarms," Dr. Beaver believed it was necessary to remove Doe from his family and place him into a residential treatment program. Long-term placement in a residential treatment facility followed by placement in a structured family-like system would be necessary for Doe since he was "at high risk for further legal difficulty and . . . for further aggressive behavioral acting out." According to Dr. Beaver, such treatment would likely be necessary throughout Doe's twenties.

The Juvenile Probation Department's waiver report also recommended that Doe remain in the juvenile system. The report's recommendation was based on the consensus of a screening team composed of ten juvenile correction officials. After evaluating the waiver factors contained in Idaho Code section 20-508(8), the screening team concluded that juvenile jurisdiction was preferable given Doe's age, level of maturity, and lack of competence to stand trial as an adult. Further, the team believed that there were services available in the juvenile correction system that could meet Doe's needs while, at the same time, protecting the community. Because of Doe's young age and limited intellectual abilities, the team opined that he could be treated more effectively in the juvenile system.

Despite the recommendations against waiving juvenile jurisdiction, the magistrate judge granted the State's motion to waive Doe into adult court on November 26, 2007. The court concluded that adult court jurisdiction was appropriate in light of the seriousness and nature of the alleged crimes, Doe's street-wise sophistication, and the unlikelihood that Doe would benefit from staying in the juvenile system.

Doe appealed the magistrate judge's order waiving juvenile court jurisdiction to the district court, which affirmed the order after concluding that the magistrate did not abuse his discretion and that his findings were based on substantial and competent evidence. Doe then sought and obtained a stay in order to pursue a direct appeal to this Court. Because the appeal involved a minor child, we ordered Doe's appeal to be expedited. On appeal to this Court, Doe argues that the magistrate judge's decision waiving juvenile jurisdiction was an abuse of discretion and, therefore, that the district court erred in affirming the decision. The State argues

5

that Doe has failed to show that the district court, acting in its appellate capacity, erred by affirming the magistrate's order.

## II.

Our primary concern on appeal is whether the district court, acting in its appellate capacity, correctly concluded that the magistrate's decision waiving Doe into adult court was not an abuse of discretion.

## A.

A decision regarding whether or not to waive a juvenile into adult court is a matter that is within the sound discretion of the juvenile court. I.C. § 20-508(1) & (8)(g); *see also State v. Larios*, 129 Idaho 631, 634, 931 P.2d 625, 628 (1997). Accordingly, a waiver decision will be upheld on appeal so long as it was not an abuse of discretion. *Zamora v. State*, 123 Idaho 192, 194, 846 P.2d 194, 196 (1992). A waiver decision will not be regarded as an abuse of discretion when the court: (1) perceived the issue as one of discretion; (2) acted within the boundaries of its discretion and consistently with the legal standards applicable to the available choices; and (3) reached its decision through an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989); *Larios*, 129 Idaho at 634, 931 P.2d at 628. Additionally, the court's findings of fact must be supported by substantial and competent evidence. *Larios*, 129 Idaho at 634, 931 P.2d at 628.

On appeal of a decision rendered by a district court while acting in its intermediate appellate capacity, this Court directly reviews the district court's decision. *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008); *State v. DeWitt*, 145 Idaho 709, 711, 184 P.3d 215, 217 (Ct. App. 2008). However, to determine whether there was an abuse of discretion, we must independently "examine the magistrate record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings." *DeWitt*, 145 Idaho at 711, 184 P.3d at 217. "If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we [will] affirm the district court's decision as a matter of procedure." *Losser*, 145 Idaho at 672, 183 P.3d at 760 (quoting *Nicholls v. Blaser*, 102 Idaho 559, 561, 633 P.2d 1137, 1139 (1981)).

**B.**

On appeal, Doe concedes that the magistrate judge cited applicable law and applied the correct burden of proof, but argues that the court's decision was an abuse of discretion because it was not based on substantial and competent evidence. He challenges several of the magistrate's factual findings and its decision not to follow the recommendations of Dr. Beaver and the screening team. In making his arguments, Doe relies primarily on the waiver criteria announced by this Court in *State v. Gibbs*, 94 Idaho 908, 500 P.2d 209 (1972). The State argues that the district court correctly concluded that the magistrate's findings of fact were supported by substantial and competent evidence and that the findings justified the magistrate's decision to waive juvenile court jurisdiction.

**1.**

Under the Juvenile Corrections Act (JCA), I.C. §§ 20-501 to -549, juvenile courts have "exclusive, original jurisdiction over any juvenile"[5] who engages in an act or omission in the state of Idaho that "is a violation of any federal, state, local or municipal law or ordinance which would be a crime if committed by an adult."[6] I.C. § 20-505(2); *see also* I.C. § 18-216. Such jurisdiction may only be retained until the juvenile reaches twenty-one years of age.[7] I.C. § 20-507. An adult court may, however, obtain criminal jurisdiction over a juvenile when the juvenile court lacks jurisdiction under the JCA or enters an order waiving such jurisdiction. I.C. §§ 18-216(1), 20-508 & 20-509. Because the juvenile court in this case had jurisdiction under the JCA, the adult court could only obtain jurisdiction over Doe through the issuance of a waiver order.

Pursuant to Idaho Code section 20-508(1)(a), a juvenile court may only waive jurisdiction over a juvenile under the age of fourteen when he or she is alleged to have

---

[5] A juvenile is defined as "a person less than eighteen . . . years of age or who was less than eighteen . . . years of age at the time of any act, omission or status bringing the person within the purview of [the JCA]. I.C. § 20-502(11).

[6] There are exceptions to this general rule, however, they are inapplicable in this case. *See* I.C. § 20-505(4), (5), (6) & (7).

[7] The Department of Juvenile Corrections (DJC) may release a juvenile under its jurisdiction before he or she turns twenty-one based upon its established guidelines. I.C. § 20-533(1). The JCA permits juveniles to be released "to their own home, to a residential community based program, to a nonresidential community based treatment program, to an approved independent living setting, or to other appropriate residences." I.C. § 20-533(2). During such time, the juvenile must "remain on probation until the probation is terminated by the court." *Id*.

committed certain enumerated crimes.[8]  I.C. § 20-508(1)(a); *see also State v. Kavajecz*, 139 Idaho 482, 484-85, 80 P.3d 1083, 1085-86 (2003).  Those crimes are set forth in section 20-509 and include attempted murder, forcible sexual penetration by the use of a foreign object, and battery with the intent to commit murder.  I.C. § 20-509(1)(a), (d) & (g).  Before waiving juvenile jurisdiction, the court must "order a full and complete investigation of the circumstances of the alleged offense" and of certain waiver factors.  I.C. § 20-508(3); Idaho Juv. R. 26(a)(2).  The court must also hold an evidentiary hearing on the record and give written notice of the hearing to the juvenile and his or her parents or guardian.  I.C. § 20-508(4) & (5).  If, as a result of the hearing, the court determines that juvenile jurisdiction should be waived, it must "enter findings of fact and conclusions of law upon which it bases such decision."  I.C. § 20-508(6).  The court must also enter an order or decree waiving juvenile jurisdiction and "binding the juvenile over to the authorities for prosecution under the criminal laws of the state of Idaho."  *Id.*; *see also Larios*, 125 Idaho at 730, 874 P.2d at 541.  On the other hand, if the court determines that juvenile jurisdiction should not be waived, the State may proceed against the juvenile under the JCA.  I.C. § 20-508(6).

Idaho Code section 20-508(8) sets forth six factors courts must consider in determining whether or not to waive a juvenile under the age of fourteen into adult court.[9]  I.C. § 20-508(8).  Those factors are: (1) "[t]he seriousness of the offense and whether the protection of the community requires isolation of the juvenile beyond that afforded by juvenile facilities"; (2) "[w]hether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner"; (3) "[w]hether the alleged offense was against persons or property, greater weight being given to offenses against persons"; (4) "[t]he maturity of the juvenile as determined by considerations of his home, environment, emotional attitude, and pattern of living"; (5) "[t]he juvenile's record and previous history of contacts with the juvenile corrections system"; and (6)

---

[8] When a juvenile who has reached the age of fourteen is charged with one of the enumerated crimes, he or she will be automatically waived into adult court.  I.C. § 20-509; *see also State v. Larios*, 125 Idaho 727, 729, 874 P.2d 538, 540 (1994).  The juvenile's age at the time he or she allegedly committed the offense governs.  I.C. §§ 20-502(11) & 20-505; *see also Larios*, 125 Idaho at 729, 874 P.2d at 540.

[9] The provision was formerly codified at section 16-1806 of the Youth Rehabilitation Act, however, it was amended in 1995 and incorporated into the JCA.  *See* 1995 Idaho Sess. Laws ch. 44, § 9, pp. 77-78.  The substance of the provision was, for the most part, left unaltered.  Accordingly, the cases interpreting the waiver factors formerly contained in section 16-1806 remain relevant.

"[t]he likelihood that the juvenile will develop competency and life skills to become a contributing member of the community by use of facilities and resources available to the juvenile court." I.C. § 20-508(8)(a)-(f). The weight given to each factor is within the discretion of the juvenile court. I.C. § 20-508(8)(g); *see also State v. Christensen*, 100 Idaho 631, 633, 603 P.2d 586, 588 (1979). Moreover, the court's decision to waive juvenile jurisdiction may be based on any single factor or combination of factors.[10] I.C. § 20-508(8)(g). In its order of waiver, however, the court must state the factor or factors it relied on in reaching its decision. *Id*.

**2.**

In his brief on appeal, Doe primarily relies on our decision in *State v. Gibbs*, 94 Idaho 908, 500 P.2d 209 (1972), rather than the section 20-508(8) factors. Accordingly, a discussion of the applicability of *Gibbs* is warranted.

Before the enactment of the section 20-508(8) factors, this Court announced three criteria to guide juvenile courts in making waiver decisions. *See Gibbs*, 94 Idaho at 916, 500 P.2d at 217. Specifically, we held that juvenile court jurisdiction will ordinarily be waived when:

> (1) the defendant has acquired such a degree of emotional or mental maturity that he is not receptive to rehabilitative programs designed for children; (2) although the defendant is immature, his disturbance has eluded exhaustive prior efforts at correction through existing juvenile programs; or (3) the defendant is immature and might be treated, but the nature of his difficulty is likely to render him dangerous to the public, if released at age twenty-one, or to disrupt the rehabilitation of other children in the program prior to his release.

*Id*. We reasoned that identifying criteria for waiver was necessary since the waiver statute at the time "provide[d] no such standards." *Id*. at 915, 500 P.2d at 216. The lack of legislative

---

[10] Doe argues that this Court should "view with caution" the provision in section 20-508(8)(g) allowing juvenile courts to base waiver decisions upon any single factor. Doe points out that the Legislature enacted the provision at a time when juveniles under the age of fifteen could never be waived into adult court. *See* 1995 Idaho Sess. Laws ch. 44, §§ 9 & 10, pp. 77-79; 1981 Idaho Sess. Laws ch. 162, § 1, pp. 284-86; 1977 Idaho Sess. Laws ch. 165, § 2, pp. 427-29. It was not until several years later that the statute was amended to allow courts to waive juvenile jurisdiction over juveniles under the age of fourteen who have allegedly committed certain violent offenses. *See* 1995 Idaho Sess. Laws ch. 47, §§ 1 & 2, pp. 111-13; *see also* I.C. §§ 20-508 & 20-509. Doe's argument ignores the principle of statutory construction requiring courts to presume that when the Legislature amends portions of a statute and leaves certain language unchanged, it intended the result of the amendments. *See Stroud v. Dep't of Labor & Indus. Servs.*, 112 Idaho 891, 892-93, 736 P.2d 1345, 1346-47 (Ct. App. 1987). By amending section 20-508 to allow waiver of juvenile jurisdiction over juveniles under the age of fourteen and leaving the factors and standards governing waiver intact, the Legislature presumably intended for those same standards to apply to juveniles aged fourteen and younger. Furthermore, Doe's single factor argument is unpersuasive because we are not presented here with the situation of a waiver having been granted upon a single factor.

guidance inhibited juveniles' ability to prepare for waiver hearings, raised due process and equal protection concerns, and prevented meaningful appellate review. *Id*. at 915-16, 500 P.2d at 216-17.

Doe argues that the magistrate's waiver decision was an abuse of discretion under the *Gibbs* criteria. He argues that under *Gibbs* juvenile jurisdiction should not have been waived because he is still susceptible to rehabilitative programs designed for juveniles, he has not eluded prior exhaustive efforts through existing juvenile programs, and his problems are not likely to render him dangerous after he is released upon reaching age twenty-one.

Doe's focus on the *Gibbs* criteria is misplaced. Those criteria do not control a magistrate judge's decision to waive a juvenile under the age of fourteen into adult court – such decisions are now governed by the section 20-508(8) factors. *Gibbs* was decided before the Legislature amended the waiver statute to include the six factors courts must now consider in making waiver decisions. The decision was premised on the need to guide juvenile courts' discretion in determining whether juvenile jurisdiction should be waived. Today, the current statutory scheme negates the necessity of the criteria announced in *Gibbs*. Because the Legislature has enacted specific factors for courts to consider in making waiver decisions, the three *Gibbs* criteria are no longer applicable, even if, as Doe contends, they make better public policy sense. *See Zamora v. State*, 123 Idaho 192, 196, 846 P.2d 194, 198 (1992) (holding that *Gibbs'* interpretation of the term "full investigation" did not control after the Legislature amended the waiver statute to define the term). Accordingly, the issue of whether the magistrate court abused its discretion in waiving Doe into adult court and, therefore, whether the district court erred in affirming the waiver order, must be analyzed under section 20-508(8).

**3.**

Doe argues that the magistrate's waiver decision was an abuse of discretion because it was not based on substantial and competent evidence. He argues that there was "insufficient evidence . . . [for the magistrate] to disregard the well-reasoned recommendation of the Waiver Committee." According to Doe, the magistrate should have adopted the waiver report's recommendation because it was based on expert opinions and a thorough consideration of the relevant waiver factors. The State, on the other hand, argues that the court's waiver order was not an abuse of discretion because it was justified by factual findings that were supported by substantial and competent evidence.

The district court did not err in affirming the magistrate's order waiving juvenile court jurisdiction over Doe. After the State filed its motion to waive Doe into adult court the magistrate ordered a full and complete investigation of the circumstances of the alleged offenses and the section 20-508(8) factors. The court then gave Doe and his parents notice of the waiver hearing, held the hearing on the record, and issued its findings of fact and conclusions of law.

Upon review of the magistrate's findings and conclusions, it is clear that the magistrate's decision to waive Doe into adult court was not an abuse of discretion. The magistrate court recognized the issue before it as one of discretion, acted within the bounds of its discretion and consistently with legal standards, and reached its decision through an exercise of reason. Initially, the court concluded that, even though Doe was only twelve years old at the time he allegedly committed the offenses, he was eligible for waiver because all three offenses were included in section 20-509. It then set forth the legal standards that governed its decision. The court acknowledged that, in deciding whether to grant the State's motion for waiver, it was required to consider the factors set forth in Idaho Code section 20-508(8).[11] Significantly, the court recognized that the weight to be given each waiver factor was discretionary. It then noted that it could base its decision on any single factor or combination of factors. Only after considering all of the section 20-508(8) factors, however, did the court decide to waive Doe into adult court. Because the court found that five of the six factors favored waiving juvenile court jurisdiction, it determined that Doe should be tried as an adult. Contrary to Doe's assertions, the court's findings relating to those factors were supported by substantial and competent evidence.

The court's conclusion that the first factor – the seriousness of the offense and the need for protecting the community – favored waiving juvenile court jurisdiction was supported by substantial and competent evidence. Doe was charged with committing three violent felonies, each of which "could have resulted in death or great bodily injury." Thus, there was substantial and competent evidence to support the court's conclusion that the crimes Doe allegedly committed were serious. Similarly, there was evidence in the record to support the court's conclusion that juvenile facilities would not adequately ensure community protection. If tried as a juvenile, Doe would only remain under the jurisdiction of the DJC until he reached age twenty-one and could possibly be released even sooner. However, Dr. Beaver believed it was necessary

---

[11] Although the court was concerned with the *Gibbs* criteria and ensuring that Doe receive the most advantageous treatment, the court's decision primarily focused on the section 20-508(8) factors.

for Doe to remain in a structured environment for several years in order to minimize the possibility that he would reoffend. Because Doe would likely require structured treatment beyond his release from the DJC, the court did not err in concluding that retaining Doe in the juvenile system would not adequately protect the community.

The court's finding that the second section 20-508(8) factor – whether the offense was committed in an aggressive, violent, premeditated, or willful manner – favored waiving Doe into adult court was also supported by the record. Doe allegedly removed R. M. from her home, concealed her, and put a sock in her mouth to prevent her from screaming. Thus, the circumstances surrounding the alleged offenses justified the court's conclusion that, if Doe was the person who committed the crimes against R. M., he acted willfully and with a certain level of premeditation. Because the victim sustained serious and potentially life-threatening injuries, there was also evidence to support the court's conclusion that the crime was committed in a violent and aggressive manner.

Next, waiving Doe into adult court was supported by a consideration of the third section 20-508(8) factor, which asks whether the alleged offense was committed against persons or property. Here, the crimes Doe allegedly committed were perpetrated against a person rather than property and, therefore, the court was justified in concluding that this factor favored waiving juvenile jurisdiction. Since section 20-508(8)(g) grants courts discretion to assign weight to each factor, the court did not err by giving greater weight to this factor based on its finding that the victim was a young, five-year-old girl.

The court's conclusion that the fourth factor – addressing the maturity of the juvenile in light of his home, environment, emotional attitude, and pattern of living – favored waiving juvenile court jurisdiction was also supported by the evidence. Although the court acknowledged that Doe was only twelve years old at the time he allegedly committed the offenses, had a below average I.Q., and was behind other students his age at school, it ultimately concluded that Doe was "a street wise minor" who "has developed a certain sophistication which exceeds his chronologic[al] age." In reaching this conclusion, the court relied on an incident that occurred while Doe was at NCH. After working on competency at NCH for over four months, Doe became angry during a group session and announced that he could have passed the competency test at anytime, but felt he was being railroaded. He then took the test and passed with a ninety-six percent. According to the court, this sequence of events indicated a disturbing

12

"level of deceit and sophistication." The court also relied on Doe's home environment and pattern of living. In the court's view, the frequency in which Doe engaged in adult behaviors was evidence of his increased maturity level. Doe had little supervision at home, frequently used drugs and alcohol, left his home without permission, and was often required to fend for himself. For these reasons, despite Doe's borderline mental functioning, there was evidence to support the court's conclusion that Doe's maturity level favored waiving juvenile jurisdiction.

Doe argues that the magistrate's findings that he "is a street wise minor" and "has developed a certain sophistication which exceeds his chronologic[al] age" are not supported by the evidence. He points out that the professionals involved in his case agreed that his intelligence, emotional, and maturity levels all fell significantly below those of other children his age. In making his argument, Doe relies on statements made by a NCH therapist, Dr. Beaver, and the screening team in its waiver report. In a letter reporting Doe's progress in competency training, a NCH therapist indicated that Doe "invest[s] a great deal of energy in 'frontive' behaviors attempting to appear tough, streetwise, drug savvy, and in charge." Dr. Beaver noted in his evaluation that Doe has a below-average I.Q., struggles in school, and is immature. Similarly, the waiver report stated that "[Doe] is only 12 years old and is completely dependent upon his parents" and that the juvenile probation officer had "several concerns regarding [Doe's] maturity."

Although the statements Doe relies on tend to suggest that Doe's maturity level may be below average, the magistrate's findings that Doe was street smart and sophisticated were supported by substantial and competent evidence. Testimony at the hearing indicated that Doe had "a little bit of street smarts" and was insightful, mature, and intelligent. Moreover, as the district court noted, Doe's apparent deception regarding his competency and his ability to fend for himself despite "very little positive parental guidance and supervision" supported the magistrate's findings.

Finally, there was evidence to support the court's conclusion that the sixth factor, which focuses on the likelihood that the juvenile system could provide Doe with the competency and life skills necessary for him to become a contributing member of the community, favored adult court jurisdiction. Under the JCA, Doe "would either be released back into the community after

13

completion of treatment or in any event when he turns 21 years of age."[12]  *See* I.C. § 20-507. According to the court, it was unlikely that Doe could successfully complete treatment within this period of time in light of his failure to complete substance abuse treatment while on intensive probation, low I.Q., learning disability, "serious anger issues," and tendency to engage in manipulation and deceit.  Additionally, Dr. Beaver testified that, in order to receive effective treatment, Doe would need to be placed in a long-term residential treatment facility and remain in a structured environment throughout his twenties.[13]  Without such placement Doe would likely continue to engage in increasing "aggressive behaviors in the community."  However, a representative from the Department testified that finding a placement for Doe after he was released from a residential facility would not be likely.  Because the DJC would not retain custody of Doe long enough for him to be properly treated, the court concluded that the juvenile system would not sufficiently enable Doe to become a contributing member of society.  Instead, it would be in Doe's "best interests" to be waived into adult court.  If convicted in adult court, the district court could impose a blended sentence[14] that would guarantee Doe received sexual abuse and anger management treatment.  It would also provide Doe with a structured environment "well into his 20's."

Doe challenges the court's findings relating to this factor.  He contends that the magistrate's findings that the DJC would be unable to find adequate placement for him and that juvenile commitment options would not provide him with the competency and life skills to become a contributing member of the community are unsupported by the evidence.  According to Doe, the evidence indicated that the DJC would have nine years to work with him and had several residential and therapeutic homes available to meet his needs.  The DOC, on the other hand, had little to offer Doe in terms of treatment.

---

[12] The average duration for treatment of sex offenders in the DJC's custody is approximately twenty months.

[13] Dr. Beaver based this recommendation on Doe's limited intellectual abilities, "failure at supervised probation and the inability of his family to provide the boundaries, supports, and involvement, which would be necessary to deal with [Doe] in a community based program."

[14] A blended sentence is one in which the court sentences a juvenile to the county jail or the custody of the Department of Corrections (DOC).  I.C. §§ 20-508(10)(b) & 20-509(4)(b); *see also State v. Pauls*, 140 Idaho 742, 745, 101 P.3d 235, 238 (Ct. App. 2004).  The court then suspends the sentence and places "the juvenile in the custody of the [DJC] for an indeterminate period of time until the juvenile's twenty-first birthday."  *Pauls*, 140 Idaho at 745, 101 P.3d at 238.  The court may condition the suspended sentence "upon the juvenile's compliance with all program requirements of the [DJC]."  *Id.*; *see also* I.C. §§ 20-508(10)(b) & 20-509(4)(b).  If the juvenile does not comply with the conditions, upon the filing of a petition by the DJC, the court may revoke the DJC's custody and place the juvenile in the custody of the DOC for the remainder of his or her sentence.  I.C. §§ 20-508(10)(c) & 20-509(4)(c); *Pauls*, 140 Idaho at 745, 101 P.3d at 238.

In challenging the findings, Doe relies on various statements in the waiver report and the testimony of Larry Callicut and Jeremy Player. The waiver report stated that "the [DJC] is capable of addressing [Doe's] needs while maintaining the safety of the community and other juvenile offenders." It noted that once Doe successfully completed an inpatient program, "numerous aftercare options [would be] available." These statements were supported by Larry Callicut, Director of the DJC, who testified that the DJC has several facilities for juvenile sexual offenders. Additionally, Jeremy Player, the Regional Manager of the Department, testified that the Department had therapeutic foster homes available for difficult children with social behavioral problems and mental health needs. Conversely, the report stated that the adult correction system was "not equipped to handle youthful offenders, especially not a [twelve-year-old] offender." The few treatment programs that would be available to Doe in the adult system required a minimum eighth grade reading level and were conducted in a group setting, thereby exposing Doe to adults convicted of sexually abusing children.

While Doe makes valid arguments, the magistrate's findings that the juvenile correction system would not provide adequate placement and would not ensure that Doe received effective treatment were supported by substantial and competent evidence. In making the findings, the magistrate relied in part on Doe's previous unsuccessful encounters with the juvenile justice system. Canyon County Juvenile Probation Officer, Beth Evans, testified that Doe had been on probation three times since 2001.[15] During his last period of intensive supervised probation, Doe failed to complete court-ordered substance abuse treatment, ran away in order to avoid discretionary detention time, and allegedly committed the offenses against R. M.[16] Additionally,

---

[15] Doe was placed on probation in 2001 for third-degree arson, in 2002 for malicious injury to property, and in 2005 for malicious injury to property and aiding and abetting petit theft.

[16] Doe challenges the court's reliance on his past probation violations. According to Doe, his non-compliance was viewed by the Juvenile Probation Department as "inextricably linked to, and largely a product of, a drug-laden home environment." The waiver report stated:

> [Doe] was first introduced to the juvenile probation department at the age of 7 years-old. At that time, due to his young age, little services/supervision were offered to [Doe]. When [Doe] reoffended and was placed back on probation at the age of 8, he was then placed on probation and was supervised by an intensive probation officer. At that time, [Doe] was given consequences for his actions in terms of detention time and community service work and he appeared to do very well on probation. In fact, [Doe] completed all court ordered terms and it was his parents who failed to complete the parenting classes that were ordered at [Doe's] sentencing hearing. [Doe] was released from probation in November of 2002, and did not reappear in the juvenile system until February of 2006, at the age of 11, and again in August of 2006 at the age of 12.

staff members from NCH testified that although Doe's behavior started off well, it eventually deteriorated. Residential treatment specialist Timothy Richel testified that Doe became combative with staff, exhibited manipulative behavior, and stole a safety knife and distributed razor blades to other juveniles at the facility. Team Leader Rebecca Grier testified that during his stay at NCH, Doe became increasingly aggressive and even assaulted a staff member. Based on this testimony, there was substantial and competent evidence to support the court's finding that, in light of Doe's prior encounters with the juvenile system, he would not receive adequate placement if he remained in the juvenile system.

Additionally, the evidence indicated that, even if Doe remained under the jurisdiction of the DJC for the maximum period allowed by law, he would still require further treatment. Dr. Beaver testified that Doe posed a significant risk of reoffending unless he remained in a well-structured environment beyond the age of twenty-one and that he was concerned about the juvenile system losing jurisdiction over Doe.[17] Once released from the DJC's custody there would be few tools or mechanisms for supervising or treating Doe. Moreover, in recommending that the juvenile court retain jurisdiction over Doe, both Dr. Beaver and the screening team assumed that, upon release from an inpatient treatment program, Doe could be placed in a therapeutic foster home.[18] However, Jeremy Player testified that in order to place Doe into a therapeutic foster home, his case would have to be expanded to a child protection case. Once this was accomplished, placing Doe in such a home would still be difficult because the Department would be required to try to reunify Doe with his parents. It was undisputed that placing Doe with his parents would raise significant risks of Doe reoffending. Finally, even if

---

It also stated that "[Doe's] lack of success on probation in the last five months is not entirely his fault. Due to his young age, [Doe] must rely on his parents to support the terms of his probation and ensure he attends the classes he is required to attend."

Although the statements cited by Doe do tend to support his argument, the waiver report also indicated that "[s]ince [Doe] was placed on intensive probation in September of 2006, this officer has struggled to gain compliance from [Doe] and his parents." Further, even though Doe may have done "very well" during his second run on probation, the facts that he had been placed on probation three times within a relatively short period of time and allegedly committed the offenses giving rise to the current proceedings while on probation, support the court's decision to rely on Doe's previous encounters with the juvenile justice system.

[17] Although he ultimately recommended that Doe stay in the juvenile system, Dr. Beaver stated that he had "concern about . . . once [Doe turns] 21 in terms of how do we keep somebody like [Doe] still on the right track and I don't have a good answer to that."

[18] Beth Evans testified that the screening team based its recommendation on the assumption that Doe could be placed in a therapeutic foster home after being released from the DJC. However, the team did not look into the availability of such placement and did not discuss what would happen to Doe once he reached age twenty-one.

foster home placement were possible, the Department could only keep Doe in its care until he turned eighteen.

While there was evidence to support Doe's argument that his needs could be successfully addressed within the juvenile system, there was also substantial evidence to support the magistrate's contrary conclusion. Because this Court will not reweigh conflicting evidence or attempt to judge the credibility of witnesses on appeal, we will not disturb the magistrate's findings. *See State v. Bettwieser*, 143 Idaho 582, 588, 149 P.3d 857, 863 (Ct. App. 2006) ("When we review the record to determine whether substantial evidence exists we are precluded from substituting our judgment for that of the fact finder as to the credibility of witnesses, the weight of testimony, and the reasonable inferences to be drawn from the evidence.").

Doe also disputes the court's reliance on the availability of a blended sentence. In making this challenge, Doe points out that, at least until he reaches age twenty-one, he would receive the same treatment options under a blended sentence as he would if he remained in the juvenile system. He also argues that the adult court will "not be bound to or required to issue a blended sentence" and that "[t]he possibility of a blended sentence does not lessen the State's burden to prove the appropriateness of waiver."

Doe's challenge to the magistrate's consideration of the possibility of the district court imposing a blended sentence is unpersuasive. Although section 20-508(8) does not specifically list the availability of a blended sentence as a factor courts must take into account in making waiver decisions, it was permissible for the magistrate to consider such a sentencing option in determining whether Doe should be tried as an adult. And, while Doe is correct that the district court would not be bound to impose a blended sentence if Doe was convicted in adult court, *see* I.C. §§ 20-508(10) & 20-509(4), the magistrate court was entitled to consider what it regarded to be the most effective way to ensure that Doe receive treatment "in a structured environment well into his 20's as recommended by Dr. Beaver." In light of the evidence presented below, we are unable to conclude that the court erred in determining that a blended sentence would be the most appropriate way to ensure that Doe's treatment needs are met and that the community receives adequate protection. Under a blended sentence, the court could impose a suspended sentence and commit Doe to the custody of the DJC for an indeterminate period of time not to exceed his twenty-first birthday. Doe would then receive treatment within the juvenile system, including treatment in a long-term residential treatment facility. Additionally, the court could condition

17

Doe's suspended sentence on his compliance with the DJC's program requirements. If Doe failed to comply with the conditions of his treatment program, the court could impose the suspended sentence and transfer Doe to DOC custody to serve the remainder of his sentence. This would preclude Doe from being released back into the community before successfully completing treatment. Finally, the imposition of a blended sentence during adult proceedings would address Dr. Beaver's concern that Doe remain in a structured environment throughout his twenties. The juvenile system, on the other hand, has no mechanism to ensure that Doe receive extended supervision. While we cannot be sure that Doe would succeed under a blended sentence, such a sentence would, at the minimum, address the concerns outlined in the waiver report and Dr. Beaver's evaluation.

Lastly, the court concluded that only one factor did not clearly favor waiving Doe into adult court. Specifically, Doe's record and history of contacts with the juvenile correction system were not substantial enough to warrant adult court jurisdiction.[19] Although Doe had first been placed on probation when he was only seven years old,[20] the court concluded that "he has not had the number and type of offenses, absent the current charges, which would warrant a finding that he should be waived into adult court." Nonetheless, the court ultimately concluded that the weight of the factors favored waiving jurisdiction under the JCA.

After reviewing the court's findings and its analysis of the section 20-508(8) factors, it is clear that the court did not abuse its discretion by waiving Doe into adult court. The court applied each section 20-508(8) factor to its findings, which were supported by substantial and competent evidence. It then exercised its discretion in determining that the factors favored waiving Doe into adult court.[21]

Nonetheless, Doe argues that the magistrate's waiver order was an abuse of discretion because it was contrary to the recommendations contained in Dr. Beaver's evaluation and the waiver report. He contends that there is a "broad-based consensus of professionals who agree that for Doe, the juvenile system, not the adult system, is the better approach." According to

---

[19] Between the ages of seven and twelve, Doe was charged with arson, petit theft, assault, discharge of a firearm in city limits, and malicious injury to property. However, none of those charges resulted in his commitment to the DJC – he was merely placed on juvenile probation.

[20] The magistrate erroneously stated in his order that Doe was nine years old at this time in 2001.

[21] Although the magistrate's decision did not specify the weight given to each factor, it clearly indicated that five of the six factors supported waiving jurisdiction.

*Doe*, the consensus stretches nationwide among "professionals who believe that there is no clear evidence that transfer to adult criminal court is in the best interests of either the juvenile or the public." Doe cites Steven Weller and Robin Wosje, *A Judge's Guide to Juveniles Before the Adult Criminal Court*, NATIONAL JUDICIAL COLLEGE 2 (2002), for the proposition that "transfers to adult court had a higher rate of recidivism tha[n] the non-transfers for all classes of felonies." He maintains that "juveniles who are transferred to adult court are 34 percent more likely to commit violent crimes than those who are retained in the juvenile system" and that "transferring young people to the adult criminal system is counterproductive to reducing violence." For these reasons, Doe argues that the magistrate should have retained jurisdiction under the JCA.

Although there may be truth behind some of Doe's arguments, the magistrate court did not err by declining to follow the recommendations contained in the psychological evaluation and the waiver report. The court was only required to order an investigation into the circumstances of the alleged offenses and the section 20-508(8) factors – it was not required to follow any recommendation resulting from the investigation. *See* Idaho Juv. R. 26(b) (stating that "the court *may* rely on the investigative report") (emphasis added). Moreover, neither recommendation is one of the factors section 20-508(8) requires courts to consider. Thus, the court was entitled to reach its own conclusion based upon its independent review of the evidence and the section 20-508(8) factors.

Doe's policy arguments against waiver are also unpersuasive. Even if it were true that trying juveniles as adults results in higher recidivism rates and increased violence, the Legislature was presumably willing to risk those consequences. In enacting section 20-508, the Legislature resolved the competing policy concerns relating to waiving juveniles into adult court. Ultimately, it concluded that waiver decisions involving juveniles under the age of fourteen who are accused of committing certain violent crimes should be left to the discretion of the juvenile courts. For the reasons stated above, the magistrate in this case did not abuse that discretion.

In sum, because the magistrate considered all of the section 20-508(8) factors, based its findings on substantial and competent evidence, and subsequently concluded that the weight of the factors supported waiving juvenile jurisdiction, the waiver order was not an abuse of discretion. Therefore, the district court did not err in affirming the magistrate's order.

### III.

The district court's decision upholding the magistrate's waiver order is hereby affirmed.

Justices BURDICK, W. JONES and HORTON CONCUR.


Justice Pro Tem KIDWELL, dissenting.

This case will create undesirable precedent for lowering the waiver age to twelve in Idaho. A professional evaluation committee determined that this young person should be treated as a juvenile. The subjective waiver evidence appears based primarily on the emotional circumstances. In my opinion the magistrate abused his discretion.